National Labor Relations Board, and we will hear first for Trader Joe's, Ms. Meyer. May it please the Court. My name is Arissa Meyer with Littler Mendelsohn, and I'm here on behalf of Trader Joe's Company. I've reserved five minutes of my time for rebuttal. It is ridiculous to think that an employer would be prevented from acting on multiple employee complaints of serious misconduct because the subject of those complaints had recently filed an NLRB charge. But that is effectively what the NLRB concluded in this case, despite the following undisputed facts. It is undisputed Jill Groeschel had a history of confrontations with customers and coworkers for which she had been verbally counseled. It is undisputed that she engaged in an unprotected outburst against a supervisor in October 2021 that resulted in a customer complaint and a written warning informing her that any further incidents could result in additional disciplinary action up to and including termination. It is undisputed she received a does not meet expectations performance evaluation in January 2022 for her treatment of customers and crew that warned her failure to show improvement would subject her to discipline up to and including termination. It is undisputed that in March 2022, six current and former crew members submitted complaints about Groeschel's behavior. It is undisputed that Trader Joe's promptly conducted a climate survey in response to those complaints. You gave the dates for the more recent events. What were the dates of the ones you initially spoke of? There was a September 2020 incident where she confronted a customer regarding that customer not wearing a mask in the store. There was also a September 2021 incident where she called a fellow coworker the most selfish bitch she had ever known. Lastly, it is undisputed that crew members interviewed in the climate survey corroborated several of the complaint allegations. Nevertheless, the NLRB piled inference upon inference to conclude that the real reason Trader Joe's had suspended and discharged Groeschel was not her behavior but the fact that she filed a charge. This decision is not supported by substantial evidence and therefore Trader Joe's requests that the court deny the board's order so it is not forced to reinstate an employee whose peers called her toxic, angry, aggressive, and threatening. The board erred by basing its decision that Groeschel's suspension and discharge were unlawful on three grounds, none of which constitutes substantial evidence. First, the board erred by relying on the close timing between Groeschel filing her NLRB charge and her suspension and termination. The timing of Trader Joe's actions is fully explained by the timing of its receipt of the crew complaints against Groeschel. Groeschel filed her NLRB charge on February 23, 2022. For over a month, Trader Joe's took no action against her. It was not until it received the deluge of crew complaints starting on March 22 that it suspended Groeschel and initiated an investigation within days. This intervening event negates any inference of animus that could be drawn from the temporal proximity between Groeschel's charge and her suspension. And obviously, the mere fact Groeschel had recently engaged in protected activity by filing a charge does not insulate her from subsequent discipline or otherwise prevent Trader Joe's from acting on crew complaints. Second, the board unreasonably questioned Trader Joe's reliance on the crew's statements as a basis for its subsequent actions. Put another way, the board found it suspicious that Trader Joe's would take six complaints seriously and suspend an employee pending investigation. However, mere suspicions of unlawful motivation are insufficient to establish a violation of the NLRA. The board seemingly suggests that Trader Joe's should not have done anything in response to these unprecedented number of complaints because some of them appear to have been submitted in response to Groeschel's discussions with crew about her charge. However, in doing so, the NLRB elevates one employee's Section 7 rights to file a charge over a group of employees' Section 7 rights to complain to their employer to try to improve their working conditions. Further, regardless of any individual crew motivations, it would have been wholly irresponsible for Trader Joe's to just disregard the complaints. Employers have an obligation to take such complaints seriously, especially with allegations of this nature, that an employee was bullying and belittling fellow crew, threatening them, and whipping equipment around, creating unsafe situations. Any suggestion otherwise ignores the realities of the workplace. On appeal, NLRB counsel goes even further than the board and not only argues that Trader Joe's should have wholly discounted the statements because of their purported motivation, but he also argues the crew's alleged animus towards Groeschel's protected activity should be imputed to Trader Joe's. This new argument should be rejected as it is unsupported by the law, the facts, or the board's order. These complaints were submitted by non-supervisory peers of Groeschel who had absolutely no involvement in Trader Joe's employment decisions. Further, their statements were independently investigated and substantiated by regional vice president Liz Hancock, who made the termination decision. Thus, the NLRB's attempt to impute the crew's motivations to Trader Joe's management is an extraordinary and unwarranted stretch of the cat's paw theory. In sum, the fact that Trader Joe's acted like any responsible employer would have in this situation and promptly suspended Groeschel pending investigation after receiving numerous complaints is not substantial evidence of unlawful motivation. Finally, the board erred in concluding Trader Joe's failed to conduct a meaningful investigation. Now, this is not a situation where the employer did no investigation. Rather, the board seemingly faults Trader Joe's for its type of investigation, specifically that it conducted a climate survey. However, the board itself has recognized that nothing in the act requires an employer to investigate, so it's difficult to understand how the board can then conclude that an employer conducted the wrong kind of investigation. This finding is nothing more than the board improperly substituting its own judgment for management's. In any event, there is nothing about Trader Joe's climate survey that supports an inference of animus. Indeed, there is no evidence that doing a climate survey was a deviation from Trader Joe's normal practice of investigating crew complaints, and thus there is no legal basis to conclude Groeschel was treated any differently because of her protected activity. The interview was also not one-sided. Hancock attempted to interview Groeschel before she suspended her and gave her an opportunity to submit a written statement, which she declined. Finally, Hancock interviewed 19 total mates and crew over two days. In doing so, she did not seek out quote-unquote ammunition against Groeschel as the ALJ claimed. Rather, she asked open-ended questions to better understand what was going on in the store. Even without specifically asking about Groeschel, eight crew members brought her up, and the climate survey confirmed many of the complaint allegations. Various crew members described Groeschel as a constant challenge, aggressive, an ornery person, very toxic with not-good energy, and a bully who cornered people. The investigation also confirmed she had gotten hostile in a recent discussion with a coworker about a 401k lawsuit, which, for reasons that explained in our brief, was unprotected. And more importantly, multiple crew also reported she was moving equipment around unsafely, which again, was unprotected. These were not just rehashed events, but recent and ongoing behavior for which Groeschel had not already been disciplined. This information provided a legitimate basis for Trader Joe's to terminate Groeschel for continuing to speak to crew members in an unpleasant, angry, and disrespectful manner, and for shoving carts, pulling pallets, and moving product around the floor in an aggressive manner that made crew feel uncomfortable and unsafe. For these reasons, the board's finding that Groeschel's suspension and discharge violated 8A4 is not supported by substantial evidence, and the board's order should be vacated. Before I conclude, I'll briefly mention that even if the board's findings regarding Groeschel's suspension and termination could be upheld, the board has exceeded its statutory authority in this case by ordering Trader Joe's to compensate Groeschel for all direct and foreseeable pecuniary harms under its Thrive decision. In Thrive, the board asserted newfound authority to award what this court has referred to as a draconian and novel consequential damages-like labor law remedy as a matter of course. We fully briefed our position, but in short, the language of 10C of the NLRA only authorizes the NLRB to order equitable remedies, such as reinstatement and back pay. Ordering Trader Joe's to compensate Groeschel for all direct or foreseeable pecuniary harms incurred as a result of its wrongdoing is effectively an order to pay damages, which are the quintessential form of legal relief. The Supreme Court has expressly recognized that Congress did not establish a general scheme authorizing the board to award full compensatory damages for injuries caused by wrongful conduct. And if the board can't award compensatory damages, then it certainly can't order consequential damages, which are even more attenuated. This conclusion that the board is limited to equitable relief is further bolstered by the language of Title VII's remedial provision, which was modeled after 10C of the NLRA. Section 706G of Title VII contains nearly identical language, which the Supreme Court has found to be limited to providing reinstatement, back pay, injunctions, and other equitable relief. However, it does not include compensatory or punitive damages, and indeed, the statute had to be amended in 1991 to provide for those remedies. Finally, the legislative history of the NLRA reveals that Congress specifically removed language from an initial draft that would have allowed the board specifically to order an employer to pay damages. While Trader Joe's argues that none of the board's order should be enforced, at a minimum, this court should join the Third Circuit in finding this remedy exceeds the board's authority, vacate the remedial portion of the board's order, and remand this case to the board to consider appropriate remedies. Counsel, I know the Third Circuit has adopted your position on compensatory damages. The Ninth Circuit has rejected it. Is there any additional authority that we need to be aware of in terms of the nature of the Circuit's vote on that question? I'm not aware of any further authority at this time. Excellent. Very good. You've saved time for rebuttal. Thank you. Mr. Odeski for the National Labor Relations Board. Good afternoon, Your Honors. And may it please the court, Jared Odeski for the National Labor Relations Board. The question before the court is whether the board's findings that the company acted out of unlawful motivation against Jill Groshel are one reasonable reading of the evidence. Because the answer is yes, the board seeks full enforcement of its order. So turning first to the written warning, there is no dispute in this case that Groshel's safety complaints were protected and known to the company. As to Animus, the board located it within the exchanges amongst management. There's no question that for several years early in the pandemic, the company tolerated, even welcomed some of the safety complaints that Groshel and other employees were making. But over time, as Groshel became the squeaky wheel, that started to change. So around January of 2021, when Groshel begins raising equity concerns, Hancock, who's the assistant or the regional vice president, says that Groshel was turning a positive into a negative. Fuller described Groshel as someone who might do something like this and who feels it is her calling to stand up for others. The board reasonably saw this not as praise, but as a warning signal of Animus that that might be building in the background. Then after the company in the summer of 2021 begins rolling back some of its COVID-19 safety measures, Groshel and coworkers continue to be active. But at this time, Fuller emails Hancock to say that Groshel and or others were complaining about the removal of Plexiglas. Later that month, Fuller said to Hancock that Groshel was being very vocal about the issue. Then as Groshel continued to raise safety complaints, in October of 2021, Fuller informed Hancock about Groshel's attitude following a conversation he had had with Groshel the previous week about a recent safety complaint. And from this, the board saw that Fuller and Hancock's correspondence showed an increasing frustration with Groshel's role as an advocate. That comment about attitude prompt Hancock to review the Dayforce file. And another piece of the Animus finding here is that the use of these unusual file entries to justify and find a pattern of behavior warranting discipline was further evidence of Animus. So Hancock, looking into the file, saw a significant departure in recording details. For the first time, the company was documenting safety complaints. And in the past, when the company had issued written warnings, it had done so for repeated infractions in a short period of time. So, for example, four attendance infractions in a single month, four or more customer complaints within four months and three incidents in three months. If the safety complaints were to be subtracted from the Dayforce file in the recent entries and looking to the period that would be relevant, there were only two unprotected recent incidents in the file. And this was not sufficient in the board's view to establish a pattern holding the company to its previous evidence of pattern use. Turning to the affirmative defense, it became at this point the company's burden to show that it would have issued the written warning in the absence of Groshel's protected activity. For the affirmative defense, the company focuses on the incident in October of 2021 involving Ferozen. And as its comparator here, the company points to a written warning that was issued to Hubell. But there are key differences, as the board found, between the behavior that led to these two written warnings. So to describe the Bell incident, Hubell was standing at a cash register and there was a coworker at another cash register. The coworker says to a customer in Hubell's line, please step back behind the blue line because of social distancing reasons. At that point, Hubell begins to yell out at this coworker, chastising him. This is different from the incident here. Bell was at the register serving a customer. Groshel had approached Ferozen as he passed the register, indicating that she walked away from the register and was not directly interacting with customers at that point. This was in Bell's case, there was a dispute about a customer, whereas the incident involving Groshel was one where there was a dispute about a work issue. She wanted to leave early. The Hubell incident involved a case of yelling, whereas Groshel was known to have a naturally loud voice. The customer complaint that came in said that she was yelling. We know from a testimony from Ferozen in particular that she had a naturally loud voice, and so this could have just been her speaking. And also nothing in Bell's warning indicated that it took a complaint to prompt it. In this case, Groshel's incident had not been recorded in Dayforce by Ferozen when it first came about. Ferozen didn't speak to Groshel or Fuller about the incident, and ultimately it took a customer complaint to prompt the action. I think a useful case for the court to look at here is this court's decision in Remington Lodging, which really gets into why the details matter in a case such as this. In that case, there had been an employee who had been standing at the hotel door. Their job was to greet guests coming in and out of the hotel. And that person walked away from their post and went and spoke to a manager about an issue. In that case, the court looked at the reportedly similarly situated individuals who, in this case, were two people who were standing at the door in the same role as the relevant employee and who were ignoring guests because they were having a conversation about sports. Now, those might seem similar, but this court said that that's not sufficient at the affirmative defense stage. The details matter. And so this distinction between the Bell incident and the Ferozen incident is one that the board was entitled to consider. I'll also mention that the Lucier incident, the September 2021 incident, is not relied on by the company in their affirmative defense in their opening brief. Turning to the suspension and discharge, once again, there is no dispute that Groshel's charge filing and discussions about that charge filing were protected and known to the company. As for Animus, the board finds Animus on several bases. First is the timing of the suspension and discharge relative to the charge filing. As an initial matter, just setting the stage, that raises a strong inference of Animus. Timing is known to be strong circumstantial evidence of Animus, as this court has recognized. The charge gets filed in late February, and Groshel, after several weeks talking to co-workers about the issue, is then suspended in late March before ultimately being discharged in early April. To justify the timing of these suspensions, the company points to the complaints that co-workers raised about Groshel. But this doesn't help the company's case, because it shows that the company actually seized on these as the basis for its suspension and discharge. I think a very important point about the suspension is that Hancock makes the decision to suspend and ultimately does suspend Groshel pre-investigation. Hancock knew, as the board found, that on the face of these complaints, many of them indicated they had Animus toward Groshel's charge filing. And as for those that didn't actually have it on their face, the board reasonably found that she could infer their motivation, giving their close timing to the others that came after the charge filing and discussions. The board here was not relying on a cat's paw theory, as the company purports. It was saying that Hancock herself seized on these complaints and had Animus, such that she was able to use them as the basis for suspending Groshel at this point in time. Counsel, how long after Trader Joe's gets information from its employees that another employee is bullying and belittling fellow crew members to the point of bringing them to tears, came close to running down a crew member with a pallet jack, and almost hit a crew member with a stack of product on a two-wheeler, does the company have to wait to take disciplinary action against that employee without running afoul of your board? Zero days, if the company is following its own practices. So in the case of suspension, the board is not saying that a paid suspension to conduct an administrative investigation is not something that the company can do. It's relevant to the affirmative defense, where the company could say, look at our past practice of this happening all of the time, where we choose to suspend someone pending investigation. Were there other incidences of Trader Joe's having employees run over others with pallet jacks and not having disciplinary conduct? So there's no comparative evidence that's introduced here. So you really just have this case, and we have a charge that's filed in February. When was the charge filed? February 23rd. Right, 23rd. So after that, the pallet jack is irrelevant, right? Because if I'm understanding the board's argument, the employee in the circumstance files a charge in late February 2022. And so there's nothing that Trader Joe's can do from that point forward, because in your view, anything they do will just be, quote, seizing on excuses of complaints. Is there anything that this employee could have done that would have been fireable on, say, February 28th, 2022? So I want to mention that timing is just one basis of the animus finding here. So it gives rise to this inference that could be combated by the company. Can it be combated with evidence that she almost ran somebody over with a pallet jack? I mean, Trader Joe's is a nationwide company, and there's no evidence introduced of any time that they have ever engaged in a paid suspension to conduct an administrative investigation. Absent that evidence, the board was able to draw the reasonable inference here that just suspending an employee pre-investigation, without conducting any investigation, were on the face of these complaints. They were motivated by charge filing activity. That this was driven in part by animus. But you just told me that there was no comparator. No comparator that has been introduced by the company to show that this was a reasonable action to have taken. But I thought at the very beginning of your argument, you explained that the board went through and was looking at these correspondence through the work a day file and correspondence and management and everything else. You've done your own investigation. Are you aware of any other evidence of Trader Joe's having employees that ran over somebody or nearly ran over somebody with a pallet jack? So there are certainly cases where an employee had engaged in sexual harassment or engaged in theft that the company viewed as serious. But I think another thing that is relevant here, and the reason why an investigation was so necessary, is because it's not clear that the pallet jack activity was violent in any way. We have solely the statement of employee Deming, which says on the face of it that Groeschel was saying you better watch out when she was carrying heavy merchandise, saying that you better be careful. There's an interpretation by Deming that this was bullying. We have no confirmation from Yambo of that. And at the same time, when Hancock ultimately conducts the climate survey, she finds from mate Joyce Snyder, who mentions in the climate survey that she's tried to understand Groeschel and she thinks that she's just working too fast. Well, you said the timing is just one piece of evidence of animus. So what would be the kind of thing under your board's precedent that Trader Joe's could have come back with and said, look, we get it, right? She filed a charge in February. Now we have a deluge of complaints on March 22nd, almost exactly a month to the day. Like, we're between a rock and a hard place here. What would be the kind of thing that the board could have come back with that would have disciplinary action? So I think you have the comparators here where there's sexual harassment or one instance of theft as instances where the company can point to that as saying, you know, here are our comparators. If she had taken money from the cash register, that would have justified it. Based on the comparative evidence here. But the pallet jack, no. No. And I think especially with the facts that I just mentioned where taking action against Groschel at that point, especially in light of those circumstances, it explains why an investigation was warranted to actually, you know, find out from the person who this activity had happened to. Did they put somebody on? I'm sorry. Was that Yambo? That was Lynn Yambo. Did anybody speak to her directly? Her or he? I'm not sure. So nobody spoke to Lynn Yambo directly that I'm aware of until Yambo submits her own statement, which comes in after the decision to suspend and discharge. And I think importantly, that statement makes no mention of Groschel's cart use or pallet jack use. Even though she was supposedly the victim of this pallet jack attack. She made no mention of it in the submission that she made. That's correct. And so for, you know, the board's purposes in terms of looking at the animus that existed at the time of the suspension and discharge, it is true that that comes afterwards. But I think the faulty investigation here plays a big, big role in terms of the animus finding for discharge. Because the company seems to be in a rush to get rid of Groschel. So after they put her on paid suspension, they conduct this climate survey. And there's no indication that the company conducted climate surveys as a general matter. The way that this survey was conducted was that 19 of 100 employees at the store that had been either handpicked by an assistant manager or who volunteered themselves spoke to Hancock during her time at the store. Even though she went over the course of two days, it's not clear that everyone that she spoke to was on Groschel's shift. We know that some of them were. But critically, she made no effort to speak to Carla Deming, who was the eyewitness to this account, to this incident with Lynn Yambo. And this was despite the fact that Deming's statement on its face had statements that were subject to interpretation regarding you better watch out or you better be careful. And I think there's a good reason to doubt or question Deming's perception. On page 1311 of the record, note 15, there is a discussion by the board about when Deming testified, there were inconsistencies in her testimony. And it really just went to show the value that an investigation might have had here in speaking to the one person who was an eyewitness. And I know the company talks about how Yambo had recently transferred out, not sure if it's to a different store or just left. But there was also no effort to speak to Yambo. And it's clear that Yambo was able to be in communication with the company at that point. This investigation was also in no way tailored to the allegations. There were a variety of questions that were posed generally. But there was no questions that were tailored to the activity that Groschel had engaged in. And Hancock, after the climate survey, proceeds to only take two actions herself. One is discharging Groschel. And the other is issuing Tony Denny a written warning because Hancock feared legal liability for not following up on that. There's also no probing of the question beyond the responses from the questions. So Sandy says that Groschel and Garcia butted heads. There's no follow-up on that conversation. And there's no follow-ups on any of the generalized statements. So turning to the affirmative defense, I mentioned on the suspension that it was not enough for the company to say that a suspension like this was common pending investigation. The company could have put forward evidence of past practice in such situations. And as for the discharge, most concerns were generalized, stale, and known to the company with two exceptions. First, I want to mention the Garcia incident. As the board found, this was unable to be relied on because it was protected activity. Both Groschel, who was part of the 401k, and the other employees at the store would have been covered by the 401k lawsuit. They were both involved or interested in it in their status as employees. And so asking a coworker a question, even if out of curiosity, about a protected lawsuit became protected activity. And it can't be the basis for the company's discharge. And that just leaves the handling of merchandise. So first, the company failed to show that it would have known of these allegations if not for the charge filing. Biddle, who we know had animus from the face of her complaint, prompts Deming to come forward. And this is after Jelinek had a conversation with Biddle. And Jelinek, who's an assistant manager, approaches Deming and asks for a written statement. We know that it's raised by Snyder in the climate survey, but the climate survey would not have taken place absent the protected activity. And again, Gambo does not mention it in her own statement. And the company also can't show that it would have discharged Groschel anyways. Discharge is the nuclear option in an employment relationship. The company is claiming to fire her because of her handling of merchandise, but without so much as a warning. And we know that there's competing statements that Hancock received about how the merchandise was being handled, whether it was being done threateningly or just someone was moving fast. And based on this alone, without simply a warning, and with no introduction of comparators in the affirmative defense, the company did not meet its burden at this point to show that it would have discharged Groschel anyways. Counsel, can we go back to the written warning briefly? The policy manual that the company has for its employees says, failure to treat customers with respect and crew members with respect will result in disciplinary action. Is the position of the board that, yeah, that's just empty words, and in fact, failure to provide the wow experience did not result in disciplinary actions across Trader Joe's various grocery stores? I think what the board asked is at the affirmative defense stage, a employer who has such a policy put forth evidence that it has acted based on past practice. And is there no evidence of disciplinary action from Trader Joe's for failure to provide the wow experience? There's no evidence of, in this situation, where there's merchandise that is potentially being handled in a dangerous way, but also potentially being handled in a non-dangerous way, that anyone would have been discharged for that. I'm sorry, I may, I apologize for getting the, I realize that we were talking about discharge. Oh, sorry, yes. But I wanted to return to the... Yes, the written warning. So my understanding of the warning is that's before the pallet jacks and the two... Correct, yes, apologies. Right, and so that's just the verbally abusing the customers, verbally abusing co-workers. Is that not the sort of thing that results in a written warning at Trader Joe's? So on the written warning, the board was looking to what Hancock's testimony was, which is that she'd identified a pattern of behavior. And so the board reasonably looked to evidence of when the company had identified a pattern of behavior before and applied that standard. If the court has no further questions, the board respectfully requests full enforcement. Thank you, counsel. Ms. Meyer, you have five minutes for rebuttal. Thank you. I'll just briefly address a few points. I believe that NLRB's argument highlighted some of the more implausible inferences that the NLRB drew in this case. My personal favorite is the one that, you know, even though Ms. Groeschel began making, you know, COVID complaints and raising these concerns in June of 2020, Trader Joe's did not develop Animus immediately until it magically appeared in October of 2021. In fact, the evidence shows that as Ms. Groeschel was raising her complaints, Trader Joe's was receptive. It incorporated some of her feedback, and it continued giving her positive performance reviews even after her complaints began, such as in August 2020, February 2021, and August of 2021. It wasn't until after she called Ms. Luger a bitch, until after she got into this confrontation with a supervisor, that she received that written warning and then the negative performance review. The board also points to these emails that allegedly show Animus. The NLRB cannot point to anything specific in those emails that actually shows Animus, other than the fact that the captain of the store was relaying on to his supervisor that an employee was raising concerns about COVID-19, which was obviously a major source of concern for Trader Joe's. In context, when you look at the emails, you can see that Captain Fuller was actually advocating for many of the changes that Ms. Groeschel was asking for, such as putting stickers back on the floor, putting the plexiglass back up. Again, there's nothing in these emails that actually shows Animus. Also, the day force entries that we've heard about. These are written by various mates throughout the store, which are equivalent to assistant managers, as well as the captain. The NLRB specifically points to a change in the level of detail to show Animus. However, going all the way back to 2017, the entries vary by length depending on the subject matter. So entries about attendance are very matter-of-fact short. Entries that are about a customer confrontation or a coworker confrontation, those are necessarily longer. And in fact, the longest one is from February 2017, which was well before Ms. Groeschel ever made any complaints about how Trader Joe's was handling COVID-19. The NLRB also references comparators for the written warning incident. Trader Joe's did provide evidence of a clear comparator, and that was the Hugh Bell incident. The NLRB has still failed to distinguish the Bell and the Groeschel incidents. The real differences are that Groeschel was yelling or raising her voice against a manager, whereas Bell was raising his voice against a coworker. Both of these events happened near the registers, near customers. Obviously, Groeschel's did because it resulted in a customer complaint. It was so- What's the meaning of the- took place at the bridge, and the other one took place at the register. Is that not a distinction with any meaning? I believe they both occurred near the registers. These facts that this was against a manager and involved a customer complaint, if anything, are differences that make Groeschel's behavior more severe and more worthy of a written warning. Finally, the NLRB makes much of the fact that Hancock made the decision to suspend Groeschel before she investigated the complaints. Well, again, the purpose of the suspension was non-disciplinary. It was to remove the accused from the workplace so that an investigation could be conducted. Hancock testified this practice was common. It was recommended by HR after she spoke to them, and again, it just makes common sense to do this before the investigation. If she was issuing a disciplinary suspension, then yes, you have to investigate before that. That was not this case. Are there any other questions for me? Thank you, counsel. We have your argument. I will cede my last 26 seconds. Thank you very much. The case is submitted.